Tagged opinion. Do not publish



**ORDERED in the Southern District of Florida on May 24, 2012.**

Laurel M. Isicoff, Judge
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE:                                          CASE NO. 10-26600-BKC-LMI

MICHAEL PETERSEN,                               Chapter 7

        Debtor.
_____/

MICHAEL L. PETERSEN,                            ADV. CASE NO. 10-3795-BKC-LMI

        Plaintiff,

vs.

UNITED STATES OF AMERICA,
DEPARTMENT OF TREASURY,
INTERNAL REVENUE SERVICE,

        Defendant.
_____/

### MEMORANDUM OPINION ON FINAL
### <u>JUDGMENT IN FAVOR OF THE DEFENDANT</u>

      The Debtor, Michael L. Petersen, filed this adversary proceeding seeking a determination that his tax liabilities for tax years 1994, 1995, 1996, 1997, 1998, 1999, 2000 and 2001 are dischargeable. The Defendant, the United States Department of Treasury, Internal Revenue Service (the "IRS"), asserts that the Debtor willfully evaded payment of his taxes for the years in question.  After reviewing all of the evidence presented during a two day trial conducted March

29 and 30, 2012, the stipulated facts, and applicable law, I find that the Debtor's tax obligations for tax years 1995, 1996, 1997, 1998, 1999, 2000 and 2001 are not dischargeable and that the IRS is entitled to judgment in its favor.

## FACTS[1]

Michael Petersen (the "Debtor") graduated college from the University of Wisconsin, La Crosse in 1983 with a degree in marketing.  In October 1984, the Debtor opened a tanning salon in Janesville, Wisconsin.  The tanning salon was called Sunset Tan. Although initially the Debtor worked with a partner, from 1986 to its eventual sale in 2007, the Debtor was the sole owner of the tanning salon.  In 1994, Debtor opened a second location in West Allis, Wisconsin.  The second salon was called Pro Tan.

Prior to 1992, the Debtor filed Form 1040 individual federal income tax returns and reported his income from the tanning salon on his 1040 returns.

### I. The 1992-1995 Taxes

In 1994, the Debtor was solicited by trust promoters to set up trusts that would limit his personal liability against job related lawsuits and limit his tax liability. Four trusts (Eagle Enterprises, Sunset Holdings, Sunlight Equipment, and Nova Unit Disbursement) were established so that the income and expenses from Sunset Tan and Pro Tan ran through these trusts.

The IRS conducted an examination of the Debtor's returns for years 1992 to 1995 and requested that the Debtor collapse the trusts. Thus, on September 17, 1996, the Debtor's accountant prepared and submitted the Debtor's 1992-1995 tax returns as a sole proprietor, along with a check for payment for his 1994-1995 tax obligations as reported on the September 17, 1996 returns.  On September 29, 1998, the IRS sent the Debtor a notice of deficiency for his

---

[1] These facts were stipulated to by the parties in advance of the trial.

1992, 1993, 1994 and 1995 federal income tax returns. On December 29, 1998, the Debtor filed

a petition in Tax Court contesting the IRS's proposed deficiency assessments.

On February 6, 2001the Debtor and the IRS entered into a stipulated Tax Court decision

concerning his 1994- 1995 tax returns (the "1994-1995 Stipulation"). Pursuant to the 1994-1995

Stipulation, the Debtor agreed to the following:

| Year | Tax Addition | Late Filing Penalty 26 U.S.C. §6651(a)(1) | Accuracy-Related Penalty 26 U.S.C. §6662(a) |
|------|--------------|-------------------------------------------|---------------------------------------------|
| 1994 | $40,357.00   | $10,089.00                                | $8,071.00                                   |
| 1995 | $117,867.00  | $29,466.75                                | $23,573.40                                  |

The Debtor did not pay his tax debt for 1994 and 1995 in 2001 when he entered into the

stipulated Tax Court decision.[2]

## II. The 1996-2001 Taxes

In September 2002, the Debtor received a notice of deficiency from the IRS for tax years

1996-2000.  The Debtor, through his accountant Donald Clark, filed his 1996 through 2001

federal income tax returns on December 24, 2002.  Thereafter, the IRS audited the filed returns

[2] The following payments/credits have been applied to the Debtor's 1994 and 1995 tax liabilities.

| Tax Year | Date      | Credit/Payment          | Amount    |
|----------|-----------|-------------------------|-----------|
| 1994     | 4/15/1995 | Withholding Credit      | 2,092.00  |
|          | 9/19/1996 | Payment                 | 5,363.00  |
|          | 4/15/2004 | Overpaid Credit for 2003 | 12,241.53 |
|          | 4/15/2006 | Overpaid Credit for 2005 | 1,774.00  |
|          | 4/15/2007 | Overpaid Credit for 2006 | 11,605.61 |
|          | 4/15/2007 | Interest Credited       | 4.39      |
|          | 1/22/2008 | Payment                 | 53,040.00 |
| 1995     | 4/15/1996 | Withholding Credit      | 1,123.00  |
|          | 9/19/1996 | Payment                 | 7,659.00  |
|          | 4/15/2005 | Overpaid Credit for 2004 | 720.00    |

for years 1996-2001, and on December 12, 2003, sent a notice of deficiency to the Debtor for years 1996-2001. On March 17, 2004, the Debtor filed a petition in Tax Court contesting the proposed assessments for tax years 1996-2001.

On May 6, 2005, the Tax Court entered a stipulated decision for the Debtor's 1996-2001 federal income tax liabilities based on the agreement signed by the IRS and the Debtor's counsel (the "1996–2001 Stipulation").

Pursuant to the 1996–2001 Stipulation, the Debtor agreed to the following:

| Year | Tax Addition | Late Filing Penalty 26 U.S.C. §6651(a)(1) | Accuracy-Related Penalty 26 U.S.C. §6662(a) |
|------|--------------|-------------------------------------------|---------------------------------------------|
| 1996 | $47,586.00   | $11,718.00                                | $4,758.60                                   |
| 1997 | $42,473.00   | $14,971.25                                | $4,247.30                                   |
| 1998 | $115,374.00  | $28,386.00                                | $19,398.10                                  |
| 1999 | $17,317.00   | $11,246.75                                | $1,731.70                                   |
| 2000 | $17,085.00   | $5,046.75                                 | $1,708.00                                   |
| 2001 | $7,405.00    | $18,636.75                                | $740.50                                     |

The Debtor has partially paid his tax liabilities for 1996-2001 tax years.[3]

## III. Subsequent Attempts at Resolution

On May 9, 2005, the Debtor's attorney requested a collection due process hearing. The Debtor's attorney withdrew his request for a hearing on October 17, 2005. On November 18, 2005, the Debtor submitted an offer in compromise to the IRS in the amount of $345,000 to settle his outstanding tax liability for years 1994 through 2001, which totaled over $1 million. The IRS sent the Debtor a rejection letter on October 10, 2006. The Debtor's representative then appealed the IRS's rejection on November 9, 2006. The IRS sustained the rejection of the offer-in-compromise on February 15, 2007.

## IV. Sale of the Tanning Salons and Move to Miami

On September 15, 2007, the Debtor sold Sunset Tan and Pro Tan to Tanning Acquisitions, LLC for $53,040. Tanning Acquisitions is owned by the Debtor's friend, Randy Richter. The Debtor asked Mr. Richter if he would purchase the tanning salons. The Debtor and Mr. Richter entered into an Asset Purchase Agreement for the two salons. Attached to the Asset Purchase Agreement, as Exhibit A, is a list of the assets with corresponding market values totaling $53,040 for the equipment and goodwill.

---

[3] The following payments/credits have been applied to the Debtor's 1996-2001 tax liabilities:

|      | Date       | Credit/Payment        | Amount    |
|------|------------|-----------------------|-----------|
| 1996 | 1/12/1997  | Estimated Tax Payment | 5,800.00  |
|      | 4/15/1997  | Withholding Credit    | 1,327.00  |
| 1997 | 4/15/1998  | Withholding Credit    | 1,970.00  |
| 1998 | 4/15/1999  | Withholding Credit    | 1,830.00  |
| 1999 | 4/15/2000  | Withholding Credit    | 1,967.00  |
| 2000 | 4/15/2001  | Payment               | 74,000.00 |
|      | 4/15/2001  | Withholding Credit    | 2,138.00  |
|      | 12/24/2002 | Payment with Return   | 3,102.00  |
| 2001 | 4/18/2001  | Estimated Tax Payment | 19,284.00 |
|      | 4/15/2002  | Withholding Credit    | 2,112.00  |
|      | 12/24/2002 | Payment with Return   | 67,142.00 |

In December 2008, the Debtor moved to Miami, Florida and began renting an apartment for $2,450 a month. A year later, the Debtor moved to a different apartment in Miami with a rent of $2,200 a month. In early 2009, the Debtor began working for Ashley Lynn's, Inc. as a consultant. The Debtor's salary at Ashley Lynn's is $24,000 a year.

In March 2009, the Debtor opened a bank account at Dade County Federal Credit Union. The Debtor does not normally carry a large balance over from month to month. His account statements show direct deposits from Ashley Lynn's reflecting his $24,000 a year salary. The Debtor deposits cash in his account as needed to pay his bills. The Debtor will keep this cash on hand at his house and deposit the money into his bank account as needed to pay bills.

## <u>ANALYSIS</u>

### I. When Taxes are Non-Dischargeable

Pursuant to 11 U.S.C. §523(a)(1)[4] an individual cannot receive a discharge of certain taxes including a tax "with respect to which the debtor… willfully attempted in any manner to evade or defeat such tax." 11 U.S.C. §523(a)(1)(C).

To establish that a debtor willfully attempted to evade or defeat a tax, the IRS must prove two elements by a preponderance of evidence: first, that the debtor engaged in evasive conduct,

---

[4] 11 U.S.C §523(a) states that:

> (a) A discharge under section 727, 1141, 1228 (a), 1228 (b), or 1328 (b) of this title does not discharge an individual debtor from any debt—
> (1) for a tax or a customs duty—
> (A) of the kind and for the periods specified in section 507 (a)(3) or 507 (a)(8) of this title, whether or not a claim for such tax was filed or allowed;
> (B) with respect to which a return, or equivalent report or notice, if required—
> (i) was not filed or given; or
> (ii) was filed or given after the date on which such return, report, or notice was last due, under applicable law or under any extension, and after two years before the date of the filing of the petition; or
> (C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax;

and second, that the debtor's mental state is "consistent with willfulness." *In re Mitchell*, 633 F. 3d 1319, 1327 (11th Cir. 2011).

In order to prove that the debtor engaged in evasive conduct the IRS must prove that "the debtor engaged in affirmative acts to avoid payment or collection of taxes, either through commission or culpable omission." *Id*. Failure to pay taxes and failure to file tax returns satisfies this requirement, even if the taxes are filed later.

In order to demonstrate that a debtor acted willfully, the IRS must prove that "the debtor's attempt to avoid tax liability is done voluntarily, consciously, or knowingly, and intentionally." *Id*. The IRS may meet its burden by proving that the debtor "(1) had a duty under the law, (2) knew he had that duty, (3) voluntarily and intentionally violated the duty." *Id*. (citations omitted). However, the IRS does not need to prove that the debtor acted with fraudulent intent. "The government need only show the debtor acted knowingly and deliberately," as opposed to unwittingly. *Id*. at 1328 (citations omitted),

## II. The Debtor's 1994-2001 Tax Liabilities are Not Dischargeable

There are several facts upon which the IRS relies in support of its position that the 1995-2001 tax liabilities are not dischargeable including the Debtor's failure to file timely returns for many years, the Debtor's underpayment of taxes, the Debtor's failure to own assets upon which an IRS lien could attach, the Debtor's sale of his business for a suspiciously low amount and the Debtor's decision to make significant discretionary expenditures instead of paying his tax liabilities even after he entered into stipulations for the payment of those taxes.

The Debtor clearly had and has an obligation to pay his taxes. The Debtor has acknowledged that he had a duty to pay his taxes, which acknowledgement is reaffirmed by the

1994-1995 Stipulation and by the 1996-2001 Stipulation.  Thus, the only issue I must decide is

whether the IRS has proven, by a preponderance of the evidence, that the Debtor voluntarily and

intentionally violated his duty to pay his taxes.

### a)  Making Discretionary Expenditures Instead of Paying Taxes

The first and most significant impediment to the Debtor's entitlement to a discharge is his

church contributions totaling over $414,682 after he entered into the 1994-1995 Stipulation,[5]

including $388,575 paid before the Debtor entered into the 1996-2001 Stipulation[6] and $26,107

after he entered into that second stipulation.[7] A donation to a charitable organization, including a

religious institution, is a discretionary expenditure[8] even if it is one that the contributor feels

morally compelled to make, as the Debtor testified he felt compelled.

The payment of discretionary expenditures instead of paying taxes that a tax payer knows

are owed has been found to be a voluntary and intentional violation of a debtor's duty to pay

taxes. *In re Gardner*, 360 F.3d 551, 561 (6th Cir. 2004) (a debtor willfully avoided his tax

liabilities where he acknowledged his legal responsibility to pay taxes and could have used some

---

[5] On February 6, 2001 the Tax Court entered the 1994-1995 Stipulation
[6] On May 6, 2005 the Tax Court entered the 1996-2001 Stipulation.
[7] Summary of the Debtor's donations to his church.

| Year | Amount of Donation to Church |
|------|------------------------------|
| 2002 | $127,003.00 |
| 2003 | $208,352.00 |
| 2004 | $9,220.00 |
| 2005 | $44,000.00 |
| 2006 | $5,000.00 |
| 2007 | $21,107.07 |

[8] *In re Jacobs*, 490 F.3d 913, 926 (11th Cir. 2007) ("Section 523(a)(1)(C)'s conduct requirement is further satisfied by Mr. Jacobs's large discretionary expenditures. In 2000 and 2001, Mr. Jacobs donated approximately $12,152 to the Place of Encouragement, and in 1997 he paid $12,000 to the Amelia Island Chapel.").

of his earnings to do so but made a conscious decision not to).   Moreover, even if the contribution is small in relation to the amount owed, the payment of the discretionary expenditure instead of paying taxes is evidence of willful evasion. *See In re Jacobs*, 490 F.3d 913, 926 (11th Cir. 2007).[9]

In this case, the Debtor made voluntarily contributions to his church totaling $414,682 when he had already committed to pay $158,224 in taxes pursuant to the 1994–1995 Stipulation. The Debtor testified that he did not pay the taxes because he thought he would have enough money to pay the taxes later, since he was making good money.  The Debtor argues that because he believed he would have money to pay the taxes later that it was okay for him to instead pay several hundred thousand dollars to his church.  The Debtor relies on *Rhodes v. United States (In re Rhodes),* 356 B.R. 229 (Bankr. M.D. Fla. 2006) ("*Rhodes*") and *In re Lindros*, 459 B.R. 842 (Bankr. M.D. Fla. 2011) ("*Lindros*") in support of this argument.

In *Rhodes* the debtor, Michael R. Rhodes, owned a consulting business and was also heavily invested in technology stocks. 356 B.R. at 231. In light of his current and projected financial success, in 2000, during a one year period, Mr. Rhodes purchased and leased luxury cars, made significant home improvements, and incurred other discretionary expenditures.[10] When the tech bubble burst in 2000, Mr. Rhodes' stock investments were wiped out and after the September 1, 2001 attacks his business rapidly declined. *Id*. Mr. Rhodes, once his financial situation tightened, liquidated his luxury vehicles, but continued to pay for certain business expenses, college tuition for one of his daughters, and for his families' medical expenditures. *Id*. at 232. But during the same time period, the court found, Mr. Rhodes at all times intended to pay

---

[9] Mr. Jacobs owed approximately $800,000 to the IRS. *In re Jacobs*, 2006 WL 2691516  at *1 (M.D. Fla. Sept.19, 2006).
[10] *Id*. Mr. Rhodes had an income of $1.8 million dollars during 2000.

his taxes and acted accordingly. *Id*. at 234. The court in *Rhodes* ultimately found that Mr. Rhodes' discretionary expenditures in the face of pending tax liability did not constitute a willful evasion of payment because, as soon as Mr. Rhodes financial situation changed, and shortly after the taxes were due, Mr. Rhodes continuously tried to pay his taxes, filed extensions, withheld taxes, tried to compromise with the IRS, and relied in good faith on the advice of his accountant. *Id*. at 234-35.

Similarly in *Lindros*, the debtor, Mark Wade Lindros, traded stock in 2000 and realized a high return. 459 B.R. at 845. Mr. Lindros, like Mr. Rhodes, had numerous discretionary expenses after the stock sale. *Id*. Again because of the tech bubble bursting and the September 11, 2001 attacks, the value of Mr. Lindros' stocks subsequently plummeted. *Id*. at 846. As soon as Mr. Lindros realized the magnitude of his losses he immediately curbed his expenses. *Id*. The *Lindros* court found that Mr. Lindros' expenditures were not inappropriate and the taxes were dischargeable. *Id*. at 848.

The *Rhodes* and *Lindros* cases are both factually similar to each other and both clearly distinguishable from this case. In *Rhodes* and *Lindros* both debtors invested in the stock market, had great gains followed by great losses all within a one year period,  subsequently found out that those losses would not offset the gains realized in previous years, and shortly after failing to resolve their respective disputes with the IRS filed for bankruptcy. Further and possibly most important, the *Rhodes* and *Lindros* debtors curbed their expenditures as soon as they realized the gravity of their situation, and all within a year of the time the taxes were originally due.

In this case, the Debtor chose to catch up on his tithing rather than pay taxes that had been owed for several years, and the liability for which the Debtor was aware for years prior to

10

when the 1994-1995 Stipulation was signed.  To compound the problem, even after the Debtor's financial fortune had turned, he continued to make payments to his church without paying the IRS the taxes the Debtor agreed he owed in the 1994-1995 Stipulation,  and even after he entered into the 1996-2001 Stipulation.[11]

In addition to making voluntary contributions to his church rather than pay his taxes, the Debtor also went on several vacations after he entered into the 1994-1995 Stipulation, after he entered into the 1996-2001 Stipulation, and after his fortunes turned.  While the Debtor testified that he did not spend a great deal of money on these family or church vacations, he did spend money on these trips, to venues including Hawaii, Haiti, Israel, Turkey, Costa Rica, including cruises and periodic travel to and from Wisconsin.[12] All of these trips took place after the 1996-2001 Stipulation was entered and after the Debtor claimed he could no longer afford to pay his taxes.[13]

The Debtor argues that, because he made some payment of taxes during this time period[14] it was not inappropriate for him to make these expenditures.  However, as the court pointed out in *Jacobs* "paying some of the tax liability owed does nothing to show that a debtor's failure to make full payment was not voluntary or intentional." 490 F.3d at 927.

---

[11] The Debtor argues that, because he paid some amounts towards the taxes he owed, the fact that he also made payments to the church should not be assessed against him.  However, the total amount of taxes the Debtor paid (or was credited) to the IRS on account of his 1994 and 1995 taxes totals $95,622.53.  After the Debtor entered into the 1996-2001 Stipulation, agreeing that he owed an additional $369,829.7 in taxes, the Debtor paid or was credited a total of $180,672 towards that liability. The total payments to the IRS are dwarfed by the Debtor's $414,682 church contributions.

[12] The IRS also complains that the Debtor spent over $16,000 in nutritional supplements over a period of 4½ years.  However, the Debtor testified that he lives on nutritional supplements because he doesn't cook much.  I do not find these expenditures to be inappropriate in light of the Debtor's explanation.

[13] The Debtor continues to travel back and forth to Wisconsin – during the summer, according to Randall Richter, at least once a month, notwithstanding that the Debtor does not appear to have enough money to live on.

[14] *See Supra* notes 2-3.

Thus, the IRS has proven by a preponderance of the evidence that the Debtor voluntarily and knowingly chose to pay discretionary expenditures instead of paying his taxes.

### b) Failing to file Tax Returns When Due

If a debtor fails to file tax returns when due, this is an additional basis upon which courts find that a debtor has willfully evaded the payment of taxes. *In re Mitchell* 633 F.3d at 1327.

The IRS argues that the Debtor failed to file his 1996–2001 returns until late 2002 and thus is not entitled to have those taxes discharged. The Debtor claims that his accountant was told by the IRS not to file the 1996–2001 returns until the IRS and the Debtor had determined how to treat the 1994 and 1995 tax returns, which were going through the individual/trust/individual transformation.  There is nothing in the record to support this argument other than the Debtor's testimony, which is based primarily on conversations that the Debtor testifies he had with his accountant.  Contrary evidence provided by the IRS, however, shows that the Debtor was repeatedly sent deficiency notices advising him that the returns had not been filed and were due. Def's Ex. J-K.   Moreover, even if the Debtor's understanding of the delay is correct, that is, that the accountant and agent were waiting for a resolution of the 1994 and 1995 taxes, the Debtor has provided no credible explanation why he waited from February 6, 2001 when the 1994–1995 Stipulation was signed, until December 24, 2002, a period of almost two years, before he filed his 1996–2001 returns.

The Debtor claims that he didn't receive a deficiency notice for the 1996–2001 returns until December 2002,[15] however the Debtor did not cite to any law, statutory or otherwise, that directs that a taxpayer does not have to file a return until the taxpayer receives a deficiency

---

[15] Trial Tr. Vol. 1, 42:23-25, March 29, 2012.

notice.  Indeed, I can take judicial notice that taxpayers are required to pay taxes every year if due, whether or not notice is received – taxes are due every April 15 (unless modified due to a weekend or holiday) and those taxes are due at that time, unless an extension is requested from, and granted by, the IRS. No notice is ever given to a taxpayer as a condition precedent to a tax payer's obligation to file his or her or its annual return and pay any taxes due.[16]

Thus, the IRS has proven by a preponderance of the evidence that the Debtor did not timely file his 1996 – 2001 returns.[17]

### c) Sale of the Business and Use of the Business Account Proceeds

In 2007 the Debtor sold his two tanning salons to his friend, Randy Richter, an electrician.  The sale price was based on what the Debtor claims is an appraisal of the property. However, the Debtor did not present the testimony of whomever it is that appraised the business assets; the Debtor did not even provide a copy of the appraisal. All the Debtor provided was a copy of the Asset Purchase Agreement that had an unsigned list of the assets sold, including goodwill, appended as an exhibit.[18]  The total value of the assets on the list, including $5,000 for goodwill, totaled $53,040, which Mr. Richter paid to the Debtor, and which the Debtor turned over to the IRS on account of his 1994 tax liability.  In addition, the Debtor introduced copies of the Debtor's tax return[19] for 2007 which indicates that in July 2007 the tanning salon purchased equipment valued, according to the return, at $43,395.  The 2007 return also schedules the book

---

[16] The IRS also argues that when those 1996 –2001 returns were filed the amounts due in each return were grossly understated, leading to assessment of almost $1 million in taxes and penalties.  The Debtor did successfully fight that assessment as reflected in the 1996-2001 Stipulation that reduced the amount still owing to $369,829.70.

[17] The IRS also argues that the 1994 and 1995 returns were not timely filed, but the facts regarding those returns – the trusts, collapse of the trust, etc. – are such that I find the IRS did not meet its burden as to those returns being untimely.

[18] Def's. Ex. GG.

[19] The tanning salons were operated as S corporations so all the tanning salon expenses and income appeared on the Debtor's personal tax returns.

value of the balance of the tanning salon equipment, after allowed depreciation at $122,909. [20]

Yet, on the "appraisal" attached to the Asset Purchase Agreement, dated September, 2007, only

two months after the purchase of equipment valued at $43,395, no single piece of equipment was

valued at over $17,000.  More significantly, the difference between the value of the July, 2007

purchased equipment of $43,395 and the $5,000 goodwill and the $53,040 purchase price, leaves

only $4,645 allocable value for the equipment valued on the 2007 return at $122,000.  It strains

credulity to accept the $53,040 purchase price as an accurate reflection of value.

     As further indication that the tanning salons were sold at an artificially reduced value,

even though the tanning salon business had decreased significantly over time, in 2007, the year

the Debtor sold the tanning salons to Mr. Richter, the Debtor reported income of $95,712 from

the salons.[21] Thus, it appears that the Debtor sold the tanning salons for an amount significantly

less than they were worth.[22]

     Finally, at the time of the sale, the Debtor took over $67,000 in cash from the tanning

salon corporate bank accounts, which funds the Debtor claims he used to live on but he testified

---

[20] The Debtor's 2007 tax return also shows that in July 2006 the Debtor purchased $40,108 in equipment.

[21] No tax return is in evidence for 2006, but in the Debtor's 2005 income tax return, the Debtor reported a profit of $93,603 from the business.

[22] The IRS speculates that the Debtor is getting money from Mr. Richter to live on as ongoing payment of the true purchase price of the tanning salons.  While the Debtor claims Mr. Richter is only giving him gifts,  Mr. Richter testified in his deposition that he has not given the Debtor more than a "couple thousand" dollars six or seven times in the last 3 years. Randall Richter Dep. 19:2-25August 22, 2011. While it is unbelievable that the Debtor is able to maintain the lifestyle he maintains on his $24,000 a year salary (from the company that runs the tanning salons for Mr. Richter), and that it is clear that the Debtor has sources of funds other than the gifts he claims to have received from his brother (who also testified the gifts do not total more than $30,000 during the last 3 years) or Mr. Richter, it was the IRS's burden to prove that the Debtor has been receiving income under the table, from Mr. Richter or from elsewhere, and not reporting it. This the IRS has failed to do. Mere speculation does not rise to the level of proof necessary to deny the Debtor his discharge.  However, I do find it extremely suspect that the Debtor lives as he lives based on the amount of money he claims to make ($24,000) compared to his expenses (last year over $60,000 was deposited in the bank).

he is unable to account for any of the expenses he claims he paid and is not able to explain exactly what he spent the money on, other than, "for living expenses." [23]

Courts consider the "totality of the circumstances" in determining whether a debtor willfully attempted to defeat a tax obligation. *Hamm v. United States (In re Hamm)*, 356 B.R. 263, 276 (Bankr. S.D. Fla. 2006) ("*Hamm*"). The *Hamm* court prepared a non-exhaustive list of indicia of willful tax evasion:

> (i) understatement of income for more than one year;
> (ii) implausible or inconsistent behavior;
> (iii) extensive dealings in cash;
> (iv) failure to cooperate with the IRS;
> (v) inadequate record keeping;
> (vi) transfer of assets to a family member;
> (vii) transfers of assets for inadequate consideration;
> (viii) transfers that greatly reduce assets subject to IRS execution;
> (ix) transfers made in the face of serious financial difficulties;
> (x) failure to acquire significant assets relative to a Debtor's earnings; and
> (xi) any other conduct that is likely to mislead or conceal.

*Id*.

The Debtor practically gave away his only substantial asset to a friend for inadequate consideration and while facing serious financial difficulty. Further the Debtor deals primarily in cash and keeps inadequate records. The Debtor has also failed to explain how he incurs yearly expenses of $60,000 with a yearly salary of $24,000. The Debtor's payment of discretionary expenditures instead of his taxes, his failure to timely file returns, his sale of the tanning salon for an unreasonably low price, and his continuing expenditures well in excess of his resources, all support the IRS's claim that the Debtor has willfully evaded payment of his tax obligations.

---

[23] Tr. Vol. 1, 230.

## **<u>CONCLUSION</u>**

Based on all of the foregoing[24] I find that the IRS has satisfied its burden of proving the Debtor willfully evaded payment of his taxes, and accordingly judgment shall be entered in favor of the Defendant in this adversary proceeding.  The IRS is directed to submit a final judgment consistent with this ruling.

# # #

Copies to:
James B Miller, Esq
Mara A Strier, Esq.

*Attorney Strier shall serve a conformed copy of this order on all parties in interest and file a certificate of service with the Clerk of Court.*

---

[24] The IRS relied on several other grounds in support of its argument that the taxes in dispute are non-dischargeable. However, either the grounds are cumulative (e.g., consistent underpayment of taxes), or the IRS has been unable to persuade me that the facts support judgment in the IRS's favor (e.g., the Debtor's failure to own anything on which a tax lien can attach).